**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**M.S., a minor, by his next friend,**
**mother, and natural guardian, HELENA**
**SOLTYS,**

        **Plaintiff,**

**-vs-**                                        **Case No. 6:07-cv-1481-Orl-28KRS**

**SEMINOLE COUNTY SCHOOL BOARD,**
**and KATHLEEN MARY GARRETT,**

        **Defendants.**

_____

# ORDER

The sad allegations of this case—and the multitude of companion cases also filed with this Court—are that Defendant Kathleen Garrett ("Garrett") engaged in a pattern of abusive conduct directed at a group of particularly vulnerable students entrusted to her charge as an exceptional student education teacher of autistic students at South Seminole Middle School ("South Seminole"). Some of Garrett's conduct gave rise to criminal charges in state court, resulting in a conviction on one count of child abuse.[1] In this case, M.S., the subject of the

---

[1] During the state criminal proceedings, Garrett faced three counts of child abuse and one count of aggravated child abuse. (See State Court Trial Verdict, Ex. A to Doc. 54). The court entered judgments of acquittal on the count of aggravated child abuse and one count of child abuse. (Id.). The jury returned a guilty verdict on the charge of child abuse—specifically for abuse directed at M.S.—under section 827.03(1), Florida Statutes, and acquitted her of the remaining count. (Id.). Section 827.03(1) defines "child abuse" as the "[i]ntentional infliction of physical or mental injury upon a child," "[a]n intentional act that could reasonably be expected to result in physical or mental injury to a child," or "[a]ctive encouragement of any person to commit an act that results or could reasonably be expected to result in physical or mental injury to a child." § 827.03(1)(a)-(c), Fla. Stat. However, the

abusive conduct for which a jury found Garrett guilty, alleges a claim for violation of 42 U.S.C. § 1983 and supplemental state law claims of assault (Count III), battery (Count IV), and intentional infliction of emotional distress (Count V).[2]

Now before the Court is the Motion for Summary Judgment (Doc. 57) filed by Garrett. Plaintiff has responded (Doc. 84) and Garrett has filed a reply (Doc. 104). Having considered the parties' submissions, the record evidence, and applicable case law, Defendant's Motion for Summary Judgment (Doc. 57) must be denied.

## I. Background

M.S. was born in Poland on June 25, 1991 and moved with his parents, John and Helena Soltys, to the United States in 1992. M.S. has been described as a mentally retarded and severely autistic child who is unable to dress himself, shower alone, tie his own shoes, or use the restroom without the aid of others. (John Soltys Dep. 11:21-12:5, Nov. 24, 2008). Additionally, M.S. is basically nonverbal—he has a limited vocabulary of approximately ten to twenty words—and lacks the ability to communicate in an appreciable manner. (Id. 11:18-20, 15:21-23; Vyas Dep. 76:14-16, Mar. 14, 2008). Because of his severe disabilities, M.S. was placed in a group home in 2001 after social services advised his parents it would benefit M.S.'s development. (Helena Soltys Dep. 7:20-8:8, Mar. 25, 2008; J. Soltys Dep. 9:5-21).

---

trial court withheld adjudication and sentenced Garrett to three years of supervised probation and prohibited her from applying for a teaching certificate or working in any classroom, day care center, park, or playground. (See Sentencing Order, Ex. H to Doc. 54).

[2]M.S. also asserted a § 1983 claim against Defendant Seminole County School Board ("Seminole County"). However, Seminole County has been dismissed from this suit pursuant to the Joint Stipulation for Dismissal of All Claims Against the Seminole County School Board (Doc. 97) filed by M.S.

In September 2003 at the age of twelve, M.S. enrolled as a special education student at South Seminole. (Doc. 101 at 5). South Seminole established a "co-teaching" concept for the 2003-2004 school year whereby the students would divide their time between the two teachers for autistic students, Garrett and Lisa Callovi ("Callovi"). (Id.). Under this teaching concept, Garrett emphasized vocational and life skills while Callovi focused on academics. It is alleged that during M.S.'s time in Garrett's classroom, Garrett subjected M.S. to various forms of physical, emotional, and verbal abuse and that M.S. witnessed similar acts of physical, emotional, and verbal abuse directed at his fellow classmates. (Compl. ¶¶ 20, 23). M.S. remained in Garrett's classroom through October 2004, when Garrett was removed from the classroom after complaints were made to South Seminole officials regarding her conduct towards M.S. (Doc. 101 at 5).

The events leading up to Garrett's arrest were reported on October 22, 2004 by two teaching aides—Sabrina Mort ("Mort") and Jennifer Rodriguez ("Rodriguez")—who were assigned to Garrett's classroom. The incident began when M.S. wanted to look at a magazine instead of doing his work, but Garrett refused. (Mort Dep. 14:13-17, Jan. 11, 2005). He then pinched Garrett, conduct which is common for M.S. when he does not have his way. (Id. 14:18-20). Garrett then "jerked him out of his desk so fast and flipped [his] body down on this desk, had the one arm behind him, took the other arm and put it behind him, started to lean down and with her left hand she held his head down." (Id. 14:23-15:1). Garrett then pushed M.S.'s head down across the desk while holding his hands behind his back until "his eyes were bulging" and "his lips started turning . . . a purply light blue." (Id. 15:2-11). When Mort told Garrett that M.S. had had enough, Garrett released him and

pushed Mort against the closet door and stated "This is my fucking class and I'll run it the way I see fit." (Id. 15:14-25). Rodriguez and Mort reported the incident to Alexis Agosto, the Assistant Principal at South Seminole. Garrett was convicted of third-degree felony child abuse under section 827.03(1), Florida Statutes, for this incident. (State Court Trial Verdict, Ex. A to Doc. 54).

In addition to the abuse for which Garrett was convicted, Plaintiff's Complaint contains numerous other allegations of direct abuse. Though neither of the Soltyses witnessed Garrett's abuse of M.S., Mort and Rodriguez provide the Court with information regarding Garrett's behavior. In her depositions, Mort relates several other incidents where Garrett mistreated M.S. One incident occurred when Mort took M.S. to the restroom to change his clothes because he had wet his pants, a common occurrence due to his developmental disabilities and his lack of toilet training. Garrett followed Mort and M.S. into the restroom and shut the door. Garrett told M.S. that "[y]ou will not piss in my class . . . piss your pants in my class," while repeatedly striking M.S. in the back of the head with the butt of her palm after each word. (Mort Dep. 23:1-13, Jan. 11, 2005). Mort described Garrett as "hitting him hard" and stated that the last blow was "so hard that his chin hit his knee." (Id. 23:11-16). In response to another of M.S.'s pants-wetting accidents, Garrett "smacked him on the butt" hard enough to leave "three fingerprints on his butt" which Mort noticed when she took him to change his clothes. (Id. 25:1-10). Mort also recounted that Garrett frequently hit M.S. with her fist[3] and elbow for a variety or reasons, such as to make him be quiet, to force him to

---

[3]Though at first Mort described Garrett as striking M.S. with her fists, she later clarified that this was not a closed fist but rather with "a puppet hand." (Mort Dep. 36:14-17, May 28,

continue his work, to make him stop attempting to kiss her, or to stop trying to lie down to go to sleep. (Mort Dep. 35:12-37:3, May 28, 2008). These blows were at times hard enough to cause "his whole head [to] jerk." (Mort Dep. 30:2-6, July 25, 2007).

In addition to the desk-choking incident, Rodriguez witnessed other acts of Garrett directed at M.S. Rodriguez saw Garrett take "her fist . . . and hit [M.S.] in the head," allegedly in retribution for his having hit Garrett. (Rodriguez Dep. 33:2-5, Jan. 11, 2005). This "punch"[4] was "enough to knock him off his feet" and cause him "to fall forward" approximately two feet. (Rodriguez Dep. 85:19-23, 87:5-6, Apr. 7, 2005). Rodriguez also stated that Garrett would repeatedly strike M.S. in the mouth with her elbow in an attempt to stop him from placing his mouth on her, progressively increasing the force of these blows until they were strong enough to cause M.S.'s head to "jolt back" when struck. (Rodriguez Dep. 42:17-19, Jan. 11, 2005; Rodriguez Dep. 88:16-19, Apr. 7, 2005). Both Mort and Rodriguez described the daily verbal abuse directed at M.S. and his classmates as a daily occurrence, including calling M.S. an "asshole" and using the word "fuck" often in his presence. (Mort Dep. 37:10-33, May 28, 2008; Mort Dep. 24:10-19, July 26, 2005; Rodriguez Dep. 45:15-20, May 28, 2008).

---

2008). Without further elucidation, however, the Court cannot determine what "a puppet hand" is.

[4]It is not clear to the Court in what manner Garrett struck M.S., described variously as being struck with "her fist," being struck with her "knuckles," and being "noogied." (Rodriguez Dep. 33:2-24, Jan. 11, 2005). Rodriguez later agreed with the description of being struck with the flat area formed between the tip and the second joint of the fingers. (Rodriguez Dep. 86:21-23, Apr. 7, 2005).

-5-

M.S.'s parents have alleged that his behavior deteriorated due to his experiences in Garrett's classroom. According to the Soltyses, prior to beginning school at South Seminole M.S. was a joyful child who was not aggressive towards either his siblings or others. (H. Soltys Dep. 9:9-13; J. Soltys Dep. 92:5-6). M.S. enjoyed playing with his neighbors, playing at the beach, and visiting amusement parks. (H. Soltys Dep. 11:13-13:16). The Soltyses were able to travel with M.S., including to Europe. (Id. 32:4-9).

However, the Soltyses reported that after his enrollment at South Seminole his behavior changed, including an increase in aggressive behavior. For example, the Soltyses described one incident when they brought M.S. to school and he had a panic attack, crying and screaming "no school" over and over again while attempting to run back to the car. (H. Soltys Dep. 20:22-21:3). Upon seeing Garrett, M.S.'s behavior became even worse. (Id. 21:10-17). Mr. Soltys reports that M.S. began rocking and hitting himself in the back of the head while repeating, "You fucking stupid." (J. Soltys Dep. 35:18-21). M.S. reportedly began attacking other children at the group home, his own siblings when home on the weekends, and complete strangers when in public. (H. Soltys Dep. 6:17-23, 8:15-18, 8:21-9:4; J. Soltys Dep. 45:21-46:20). The Soltyses contend that because of this increase in aggressive behavior, M.S. was unable to resume living at home with his siblings.

## II. Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). "A nonmoving party, opposing a motion for summary judgment supported by affidavits [or other relevant evidence,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e)(2) (providing that the nonmovant "must . . . set out specific facts showing a genuine issue for trial").

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. Some degree of factual dispute is expected, but to defeat a motion for summary judgment the factual dispute must be material and genuine. That is, the factual evidence must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

### III. Garrett's Motion for Summary Judgment

A. Section 1983

Garrett argues that M.S. suffered no constitutional deprivation and that even if M.S. suffered a constitutional deprivation, she is entitled to qualified immunity.[5] Government officials engaged in discretionary duties have the benefit of qualified immunity when sued in their individual capacities so long as their conduct does not violate any clearly established statutory or constitutional rights known to a reasonable person. Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002). Qualified immunity is not just a defense to liability, but it is also a defense from suit and so must be determined at the earliest possible stage of litigation. Id. (citing GJR Invs., Inc. v. County of Escambia, 132 F. 3d 1359, 1370 (11th Cir. 1998)).

A public official must first establish that she is entitled to the benefit of qualified immunity by proving that "'[s]he was acting within the scope of h[er] discretionary authority when the allegedly wrongful acts occurred.'" Id. (quoting Courson v. McMillian, 939 F.2d 1479, 1484 (11th Cir. 1991)). Once the defendant meets that burden, the plaintiff must then

---

[5]Garrett also argues in her motion for summary judgment that Plaintiff's § 1983 claims are barred by a four-year statute of limitations. Garrett argues that because M.S. filed his complaint on September 17, 2007, all incidents which occurred prior to September 17, 2003 are barred. (Doc. 81 at 22). However, "[a] cause of action under [§ 1983] will not accrue, and thereby set the limitations clock running, until the plaintiffs know or should know (1) that they have suffered the injury that forms the basis of their complaint and (2) who has inflicted the injury." Chappell v. Rich, 340 F.3d 1279, 1283 (11th Cir. 2003). Garrett inexplicably argues that Mrs. Soltys had constructive knowledge of the alleged incidents due to M.S.'s alleged increased negative behaviors during his time at South Seminole and because of Mrs. Soltys's presence during the parking lot incident in 2004. (Doc. 57 at 25). Garrett's argument that a 2004 incident gives a party constructive knowledge so as to start the running of a statute of limitations in 2003 is meritless. Under the facts of this case, the question of when M.S.'s parents knew or should have known of the abusive conduct inflicted upon M.S. and who inflicted it are questions of fact for a jury to decide, especially in light of the nature of the alleged injuries.

"show that qualified immunity is not appropriate" under the two-part test articulated in Saucier v. Katz, 533 U.S. 194, 201-02 (2001). The first question under that test is "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. If no constitutional violation is revealed after considering the facts most favorably to the plaintiff, the defendant is entitled to summary judgment. See Baltimore v. City of Albany, 183 Fed. Appx. 891, 896 (11th Cir. 2006); see also Garrett v. Athens-Clarke County, 378 F.3d 1274, 1280-81 (11th Cir. 2004). If the facts reveal a constitutional violation, the Court must then proceed to the second step of the Saucier inquiry and ask whether, at the time of the violation, the official "would have realized the acts violated already clearly established federal law.'" Id. (quoting Garrett, 378 F.3d at 1278-79); see also Kirkland ex rel. Jones v. Greene County Bd. of Educ., 347 F.3d 903, 905 (11th Cir. 2003); cf. Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250-53 (2d Cir. 2001) (construing the absence of case law in that circuit recognizing the substantive due process right in the public school setting as "a strong indication that the right to be free from excessive force is so well-recognized and widely observed by educators in public schools as to have eluded the necessity of judicial pronouncement").

As explained below, Plaintiff has presented evidence that could support a jury finding that Garrett's actions directed at M.S. were conscience-shocking, constituting excessive force in violation of his substantive due process rights. Furthermore, this right was clearly established at the time of the violation. Thus, Garrett is not entitled to summary judgment.

1. Constitutional Deprivation

The Fourteenth Amendment's substantive due process right protects persons from the arbitrary exercise of governmental power and prevents governmental power from being used for the purpose of oppression. A.B. ex rel. Baez v. Seminole County Sch. Bd., No. 6:05-cv-802, 2005 WL 2105961, at *5. Embodied in this right is the right to be free from excessive force at the hands of a government official. Dockery v. Barnett, 167 F. Supp. 2d 597, 602 (S.D.N.Y. 2001). To determine if a constitutional deprivation has occurred that would subject a government actor to § 1983 liability, the "'court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Thomas v. Bd. of Educ. of West Greene Sch. Dist., No. 2:04-cv-1661, slip op., 2006 WL 3538960, at *2-3 (W.D. Pa. Dec. 7, 2006) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). The leading case of Hall v. Tawney, 621 F.2d 607 (4th Cir. 1980), adapted the general standard to the context of corporal punishment in a school setting, concluding that "the substantive due process inquiry . . . must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." Id. at 613; see also Neal ex rel. Neal v. Fulton County Bd. of Educ., 229 F.3d 1069, 1074-76 (11th Cir. 2000).

These factors apply to the facts of this case with some difficulty given that the victim is unable to communicate and that he has significant preexisting mental and emotional

disabilities which require special care. Because of this, M.S.'s developmental disabilities must be considered in determining the need for force, the extent of injury, and the maliciousness of Garrett's actions. See Dockery, 167 F. Supp. 2d at 604 ("[T]he issue is better reserved for a jury—especially considering that . . . plaintiffs in this case are autistic children, who are more vulnerable and less capable of communicating than other children."); Roe ex rel. Preschooler II v. Nevada, 332 F. Supp. 2d 1331 (D. Nev. 2004) (denying motion to dismiss § 1983 claims against teacher who allegedly slapped an autistic, non-verbal child or made him slap himself, slammed the child into a chair, and made him walk from the bus to the classroom without shoes); see also Sutton v. Utah State Sch. for Deaf & Blind, 173 F.3d 1226, 1240 (10th Cir. 1999) (considering victim's severe disabilities in determining a principal's § 1983 liability for failure to implement policies to protect students from each other); cf. Fessler v. Giles County Bd. of Educ., No. 1-00-0120, 2005 WL 1868793 (M.D. Tenn. July 27, 2005). The conscience-shocking threshold is more quickly reached in cases where the victim is particularly vulnerable to abuse and is otherwise defenseless.

### a. Need for the Application of Force

While some of the incidents of abuse attributed to Garrett were arguably in response to misbehavior on the part of M.S., others were not. Garrett's assistants have testified that the abusive conduct—including the slamming of M.S. to his desk and pinning him until his eyes bulged out and his face turned blue—were in response to normal conduct of M.S., i.e., pinching to attract attention and the inability to control bodily functions. Garrett was arrested because of her conduct in response to M.S.'s allegedly pinching her either in an attempt to gain her attention or because of a desire not to do his assigned work. Other incidents of

abuse occurred after M.S. wet his pants, a condition over which M.S. has no control. Reasonable people may disagree as to when—if ever—corporal punishment is necessary in a school setting. However, when, as is the case here, the conduct being addressed is that of the uncontrollable behavior of a special needs student, a jury could determine that the force used by Garrett was disproportionate to any disciplinary.

### b. Extent of Injury Inflicted

While recognizing that three factors control the analysis, Garrett bases her entire argument—that Plaintiff falls short of the "shocking the conscience" standard—on the contention that M.S. did not suffer a physical injury. However, Plaintiff's evidence is sufficient if believed by a jury to establish an injury suffered at the hands of his teacher. His alleged injuries were physical, mental, and emotional, and even though his alleged injuries may be more difficult to quantify than those presented in the average case, that does not mean they are nonexistent. See Dockery, 167 F. Supp. 2d at 603 (documenting the severe psychological injuries suffered by autistic children from the use of physical force over a year's time, including an increase in violent and self-injurious conduct, the onset of compulsive masturbation, and the need to be placed on anti-psychotic medication for uncharacteristic displays of violence); Fessler, 2005 WL 1868793, at *15 (distinguishing Dockery in a case where the autistic victim was kicked and knocked down once and where the child had already displayed problem behaviors daily and even showed some behavioral improvements after the incident). The Soltyses testified that they noticed bruising on M.S.'s body, prompting them to question the group home as to the cause. (H. Soltys Dep. 68:17-69:12). The group home allegedly responded that M.S. was returning from school with the

-12-

bruising, but Mrs. Soltys paid little attention to these bruises because she believed them to be a result of M.S.'s own actions. (H. Soltys Dep. 69:15-18). The Soltyses have also testified that M.S. experienced behavioral changes and an increase in aggression.[6] M.S.'s physician has stated that M.S.'s behavior continually improved until August 2004. (Lopez Dep. 66:22-67:1, Feb. 3, 2009). Additionally, Dr. Veda Vyas, a psychiatrist treating M.S., noted that in November 2004 M.S. began exhibiting intense aggressive behavior and using language outside the norm. (Vyas Dep. 18:5-25). Though identifying a discrete psychological injury in a child who suffers from autism is difficult, the assertion that M.S.'s behavior deteriorated is supported by the record.

There is also evidence that M.S. was physically abused on multiple occasions for behavior as uncontrollable as wetting his pants, including on one occasion hitting M.S. with sufficient force to cause his chin to hit his knee and on another occasion spanking him hard enough to leave fingerprint marks. See Dockery, 167 F. Supp. 2d at 603-04 (listing the physical injuries suffered as including grabbing a child "with enough force to leave a hand print, a fingernail mark, a bruise, or to cause tears"). Additionally, evidence has been

---

[6]While Garrett has urged the Court to disregard the allegations of abuse directed at children other than M.S., the Court cannot conclude that M.S. was unaffected by the severe treatment of his classmates, particularly when he himself was physically abused by Garrett. In a classroom of fewer than ten students, all of whom were autistic, the regular use of unnecessary violence and the consistent barrage of verbal assaults could have created a harmful and perhaps emotionally abusive environment. When that environment is coupled with evidence of direct physical assault such as alleged here, the question of whether a constitutional violation occurred is one for a jury. Garrett's direct abuse of one child was a different kind of abuse for another. An absurd result might follow, particularly in this setting, if Garrett's actions were considered in a vacuum and Garrett benefitted from the fact that she mistreated all of the children rather than confining her abuse to a single child.

presented that Garrett slammed M.S. to the desk and leaned on him with enough force to cause his eyes to bulge out and his face to turn blue. A constitutional violation is determined on a case-by-case basis, and the degree of injury must be considered relative to both the need for resorting to physical force and the vulnerability and helplessness of the plaintiff. While the question may be a close one, where the victim is unable to communicate and where he requires more care than most children, summary judgment is imprudent. Against these unique facts, a less severe injury could nonetheless constitute a constitutional deprivation and the use of unnecessary and excessive force against vulnerable children is particularly malicious. As was the case in Dockery, the issue here is one for a jury. See 167 F. Supp. 2d at 604.

### c. Whether Force Was Applied in Good Faith to Maintain and Restore Discipline

The final factor to be considered in determining whether a constitutional violation has occurred is whether the force was applied in good faith or was "inspired by malice or sadism . . . amount[ing] to a brutal and inhumane abuse of official power." See id. (quoting Hall, 621 F.2d at 613). While some level of physical restraint may have appropriately been applied in a good faith attempt to restore order to the classroom after M.S. allegedly pinched Garrett, here the allegations are that excessive force was used and that this force caused M.S. pain and emotional damages. Evidence has also been presented that Garrett struck M.S. for behavior as innocent and uncontrollable as wetting his pants and attempting to place his mouth on her arm. Had Garrett only engaged in an isolated incident of aggression that did not result in serious injury, one might reasonably conclude that Garrett had been afflicted with the "unwise excess of zeal" that Hall warned might not amount to a constitutional

violation. There is evidence, however, that the incidents were not isolated but instead formed a troubling pattern of abusive conduct. Assuming that the allegations and the evidence proffered thus far are borne out at trial, it would be difficult to conclude that Garrett's actions were not malicious.

### 2. Whether the Law Was Clearly Established

The right to be free from excessive and arbitrary corporal punishment in a school context is clearly established under the precedent of the U.S. Supreme Court and the Eleventh Circuit Court of Appeals. Ingraham v. Wright, 430 U.S. 651, 672-74 (1977); Neal, 229 F.3d at 1075; Kirkland, 347 F.3d at 904. If M.S. is found to have suffered a constitutional violation, Garrett is not entitled to qualified immunity because physical assaults such as those directed at M.S.—a nonverbal, severely autistic child who lacks the ability to communicate—constitute excessive punishment and are clearly established as forbidden by the Fourteenth Amendment.

## B. State Law Claims

### 1. Assault and Battery (Counts III and IV)

Garrett argues that section 1006.11, Florida Statutes, "permits reasonable force in certain circumstances and expressly excludes excessive force or cruel or unusual punishment." (Doc. 57 at 19). The Court reiterates its statement made in J.V. that Garrett "has not been sued because she used reasonable force; indeed, the basis of all of the claims against her is that she used excessive force, exceeding the appropriate reaction to [M.S.'s] conduct." See Order Denying Summary Judgment, J.V. v. Seminole County Sch. Bd., No. 6:04-cv-1889, at 13 (M.D. Fla. filed Mar. 21, 2007) (Doc. 164). The Court again rejects the

argument that Garrett is entitled to summary judgment on the state law assault and battery claims because of the "right" afforded teachers under section 1006.11, Florida Statutes.

Garrett also asserts that she has immunity from suit pursuant to section 768.28(9), Florida Statutes, stating that Plaintiff has not alleged "that . . . Garrett acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of M.S.'s human right, safety, or property. (Doc. 57 at 19-20). Summary judgment, however, is inappropriate because the allegations against Garrett clearly fall within the exception of § 768.28(9), which provides for personal liability for employees acting in "bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." § 768.28(9), Fla. Stat.

### 2. Intentional Infliction of Emotional Distress

The tort of intentional infliction of emotional distress has four elements: "(1) the wrongdoer's conduct was intentional or reckless . . . (2) the conduct was outrageous . . . (3) the conduct caused emotional distress; and (4) the emotional distress was severe." Brown v. Brown, 800 So. 2d 359, 362-63 (Fla. 4th DCA 2001). Garrett contends that Plaintiff has not presented a cause of action for intentional infliction of emotional distress, claiming that the allegations in Plaintiff's Complaint do not rise to the level of outrageous conduct required under Florida law. (Doc. 57 at 20-21). If a jury were to accept the evidence presented by Plaintiff against Garrett as true, a jury could reasonably conclude that Garrett's actions against a non-communicative and defenseless child were "odious and utterly intolerable in a civilized community." Brown, 800 So. 2d at 362. Accordingly, summary judgment must be denied as to this Count.

IV. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that Defendant Garrett's Motion for Summary Judgment (Doc. 57) is hereby **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 10th day of July, 2009.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party